# 15-256-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆ ◆

THOMAS W. CHARRON, JR., Individually and as Trustee of the Thomas W. Charron Jr. Grantor Retained Annuity Trust dated July 8, 2010,

*Plaintiff-Counter-Defendant-Appellee,*

—against—

SALLYPORT GLOBAL HOLDINGS, INC., JPD PRIVATE TRUST COMPANY, LTD., as Trustee of the GPD Charitable Trust dated December 7, 2010, GIAN PAUL DEBLASIO, aka JOHN P. DEBLASIO,

*Defendants-Counter-Claimants-Appellants,*

JOHN DOE, as trustee of the John Deblascio Charitable Trust for World Peace and Development, SALLYPORT GLOBAL SERVICES, LTD., as Trustee of The John Deblasio Charitable Trust for World Peace and Development,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## [PAGE PROOF] BRIEF FOR DEFENDANTS-COUNTER-CLAIMANTS-APPELLANTS

LISA SCHIAVO BLATT
ARNOLD & PORTER LLP
555 12th Street, NW
Washington, DC 20004
(202) 942-5842

JAY P. LEFKOWITZ, P.C.
DAVID S. FLUGMAN
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Attorneys for Defendants-Counter-Claimants-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellant Sallyport Global Holdings, Inc. certifies that it is wholly owned by KS International, LLC and that no publicly held entity owns 10% or more of its stock. Defendant-Appellant JPD Trust Company, Ltd. certifies that it has no parent company and that no publicly held entity owns 10% or more of its stock.

# TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ................................................................1

STATEMENT OF THE CASE................................................................2

    A.    DeBlasio Partners With Charron in Old Sallyport...............................4

    B.    DeBlasio Buys Out Charron's Interest in Old Sallyport......................6

    C.    DC Capital Acquires Old Sallyport for $64.5 Million........................10

    D.    The Parties Exclude Excess Cash and Non-Operating Assets from the DC Capital Transaction ........................................................16

    E.    Proceedings Below................................................................17

SUMMARY OF ARGUMENT ................................................................20

STANDARD OF REVIEW ................................................................22

ARGUMENT ................................................................22

I.    THE DC CAPITAL TRANSACTION DID NOT TRIGGER THE WINDFALL PROVISION BECAUSE DEBLASIO SOLD OLD SALLYPORT FOR LESS THAN $65 MILLION................................................................22

    A.    DeBlasio and the Charitable Trust Received $64.5 Million for the Sale of Old Sallyport ................................................................24

    B.    There is No Legitimate Basis to Re-Value the 38% Rollover Equity in New Sallyport................................................................26

    C.    The $2.75 Million in Assigned Loans Were Non-Operating Assets................................................................36

II.  THE WINDFALL PROVISION ONLY ENTITLES CHARRON TO
20 PERCENT OF THE EXCESS PROCEEDS OVER $65 MILLION ....... 39

    A.  The Text of the Windfall Provision Limits Charron's Windfall
Protection to 20 Percent of the Excess over $65 Million.................... 39

    B.  Extrinsic Evidence Confirms the Parties' Intent to Limit
Charron's Windfall Protection to 20 Percent of the Excess over
$65 Million ........................................................................................... 44

    C.  Even if the Text of the Windfall Provision Gave Charron 20
Percent of the Total Sale Proceeds, the District Court Should
Have Reformed the Contract ............................................................... 48

CONCLUSION ...................................................................................................... 52

iii

# TABLE OF AUTHORITIES

**Cases**

*3Com Corp. v. Banco do Brasil, S.A.*,
   171 F.3d 739 (2d Cir. 1999) ...............................................................45

*Atwater & Co. v. Panama R.R. Co.*,
   246 N.Y. 519 (1927) ...........................................................................40

*Benderson Dev. Co., Inc. v. Schwab Bros. Trucking, Inc.*,
   64 A.D.2d 447 (4th Dep't 1978).................................................... 48, 49

*Charron v. Sallyport Global Holdings, Inc.*,
   No. 12-cv-6837 (WHP), 2014 WL 7336463 (S.D.N.Y. Dec. 24, 2014)...... passim

*Chimart Assocs. v. Paul*,
   66 N.Y.2d 570 (1986) .........................................................................50

*Collins v. Harrison-Bode*,
   303 F.3d 429 (2d Cir. 2002) ...............................................................22

*Compagnie Financiere de CIC et de L'Union Europeenne v.*
   *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   232 F.3d 153 (2d Cir. 2000) ...............................................................45

*Cordell v. McGraw-Hill Co.*,
   No. 12 Civ. 0637 (ALC) (RLE), 2012 WL 5264844
   (S.D.N.Y. Oct. 23, 2012), *aff'd*, 525 F. App'x 22 (2d Cir. 2013) ................ 27, 28

*Cruden v. Bank of N.Y.*,
   957 F.2d 961 (2d Cir. 1992) ......................................................... 23, 29

*Diversified Mortg. Investors, v. U.S. Life Title Ins. Co. of N.Y.*,
   544 F.2d 571 (2d Cir. 1975) ...............................................................23

*Gulf Ins. Co. v. Transatlantic Reins. Co.*,
   69 A.D.3d 71 (1st Dep't 2009) ...................................................... 48, 49

*Healy v. Rich Prods. Corp.*,
   981 F.2d 68 (2d Cir. 1992) ........................................................... 22, 48

iv

*JA Apparel Corp. v. Abboud*,
  568 F.3d 390 (2d Cir. 2009) ................................................................45

*Kass v. Kass*,
  91 N.Y.2d 554 (1998) ........................................................................40

*Mastrovincenzo v. City of N.Y.*,
  435 F.3d 78 (2d Cir. 2006) .................................................................42

*Merion Capital L.P. v. 3M Cogent, Inc.*,
  No. 6247-VCP, 2013 WL 3793896 (Del. Ch. July 9, 2013) ........................ 38, 39

*Nat'l Am. Corp. v. Fed. Republic of Nigeria*,
  597 F.2d 314 (2d Cir. 1979) ...............................................................49

*Nat'l Market Share, Inc. v. Sterling Nat'l Bank*,
  392 F.3d 520 (2d Cir. 2004) ...............................................................22

*Tougher Heating & Plumbing Co. v. State*,
  73 A.D.2d 732 (3d Dep't 1979).............................................................43

*U.S. Lines (S.A.), Inc. v. United States (In re McLean Indus., Inc.)*,
  162 B.R. 410 (S.D.N.Y. 1993),
  *overruled on other grounds*, 30 F.3d 385 (2d Cir. 1994) .............................. 29, 33

*U.S. Trust Co. of N.Y. v. Alpert*,
  10 F. Supp. 2d 290 (S.D.N.Y. 1998), *aff'd sub nom.*,
  *U.S. Trust Co. of N.Y. v. Jenner*, 168 F.3d 630 (2d Cir. 1998)............................23

*Vertical Indus. Park Assocs. v. United Merchants & Mfrs., Inc.*
  *(In re United Merchants & Mfrs., Inc.)*,
  623 F.2d 804 (2d Cir. 1980) ................................................................42

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
  1 N.Y.3d 470 (2004) ..........................................................................26

*William Press, Inc. v. State*,
  37 N.Y.2d 434 (1975) ........................................................................40

*Winmar Co. v. Teachers Ins. & Annuity Ass'n of Am.*,
  870 F. Supp. 524 (S.D.N.Y. 1994) .......................................................49

v

*World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co.*,
  345 F.3d 154 (2d Cir. 2003) ..................................................................42

## Other Authorities

11 *Williston on Contracts* § 32:11 (4th ed. 2014) ...................................42

21 N.Y. Jur. 2d Contracts § 21 (1982)....................................................48

Black's Law Dictionary (10th ed. 2014) ......................................... 24, 40

Shannon Pratt & Roger Grabowski,
  *Cost of Capital: Applications and Examples* 203 (4th ed. 2010).........................38

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1332(a)(1). This Court has jurisdiction under 28 U.S.C. § 1291. The District Court entered final judgment on December 31, 2014, and Defendants-Appellants timely filed their notice of appeal on January 28, 2015.

## STATEMENT OF ISSUES

1.     Whether the District Court erred in revaluing the purchase price of a commercial transaction negotiated at arm's length between Defendant-Appellant John P. DeBlasio ("DeBlasio") and third party DC Capital Partners ("DC Capital") absent a finding of fraud, collusion, or similar misconduct.

2.     Whether the District Court erred in concluding that certain loans were operating assets that should have been included in the DC Capital transaction purchase price, where the parties to the transaction did not include them in the price, did not consider them operating assets, and structured the transaction on a "cash free, debt free" basis.

3.     Whether the District Court erred in concluding that a Windfall Provision of a buyout agreement clearly and unambiguously granted Plaintiff-Appellee Thomas W. Charron, Jr. ("Charron") the right to receive 20% of the total proceeds from the DC Capital transaction, rather than 20% of only the amount of the DC Capital transaction purchase price that represented a windfall.

1

4.     Alternatively, whether the District Court erred in refusing to find a mutual mistake warranting reformation of the Windfall Provision to conform to the parties' intent that Charron would receive 20% of only the amount of the DC Capital transaction purchase price that represented a windfall.

## STATEMENT OF THE CASE

This case represents a frontal attack on the sacrosanct principle that, in the absence of fraud or other misconduct, courts must enforce the express written terms of commercial contracts. In December 2010, DeBlasio bought out Charron's 50% interest in the defense contracting company they jointly had owned and operated. Negotiated and drafted with the aid of two of the country's preeminent law firms, the buyout agreement included a "Windfall Provision" providing that if DeBlasio sold the company for $65 million or more within a year, he would pay Charron 20% of the excess proceeds over that amount. Six months later, the company was acquired by an affiliate of a private equity firm, DC Capital, for $64.5 million—$60.7 million in cash, plus a 38% equity stake in the surviving entity in lieu of an additional $3.8 million. The parties to the DC Capital transaction also were advised by experienced counsel, as well as numerous accountants and consultants. The purchase agreement resulted from heated, arm's-length negotiations, and was not the product of fraud or any other misconduct.

2

Nevertheless, disregarding the express terms of both agreements, the court below (Pauley, J.) concluded that the "true value" DeBlasio received in the DC Capital transaction was not $64.5 million, but rather $81.7 million—enough to trigger the Windfall Provision in the DeBlasio-Charron buyout agreement. The court determined that DeBlasio and DC Capital had undervalued the company radically and that DeBlasio's $3.8 million rollover equity interest was "really" worth a staggering $18.3 million—almost five times the amount to which DeBlasio, DC Capital, and third-party investors had agreed. The court also included $2.75 million in loans the company assigned to DeBlasio before the DC Capital transaction closed, even though the parties had agreed that the loans had no operational value to the company and thus were equivalent to retained earnings that properly belonged to DeBlasio. Adding insult to injury, the court then awarded Charron damages of not just 20% of the *excess* sale proceeds over $65 million—*i.e.*, the proceeds that supposedly represented a "windfall" to DeBlasio— but rather 20% of the *total* sale proceeds. By so doing, the District Court handed a windfall to Charron—and an unjust windfall at that.

The decision below is not only wrong, it is dangerous. Courts cannot revalue commercial transactions at will, especially those negotiated at arm's length by sophisticated business parties aided by well-heeled counsel. This case does not involve fraud, undue influence, overreaching, violations of public policy, or any

3

other basis to discard a contract's plain terms. Instead, it involves a typical private equity transaction featuring several interrelated parts, none of which can be viewed in isolation and all of which were thrown into disarray by the court's decision to isolate and revalue just one component of the deal. If courts can cast aside a fully integrated written agreement between sophisticated, well-counseled businesspeople like this one simply because a judge values one portion of the consideration differently than the parties did, then no transaction is safe from judicial reappraisal. And if courts will not enforce agreements as written, parties who desire certainty will have to spend significantly more on lawyers and insurance, or simply forgo transacting at all. As it stands, the decision below threatens to destabilize the private equity market and hinder economic activity more broadly. It must be reversed.

## A. DeBlasio Partners With Charron in Old Sallyport

John P. DeBlasio is a decorated veteran. After graduating from West Point in 1989, DeBlasio joined the Army as an infantry officer. He served twenty-one years in active and reserve military service, including a tour in Iraq. DeBlasio was awarded the Bronze Star, an honor bestowed upon service members for heroism,

meritorious achievement, or meritorious service in combat. He retired from the Army in 2010 as a lieutenant colonel. (A[1]-__ (Tr.[2] 220:21-221:10).)

After transitioning from active to reserve military status, DeBlasio began to explore business opportunities supporting the U.S. government's military operations in Iraq and elsewhere. (A-__ (Tr. 221:9-24).) By 2004, he had entered into a number of consulting agreements to assist companies providing support services to the U.S. military in Iraq. (A-__ (Tr. 222:1-20).) Around that time, DeBlasio met Charron, who recently had founded Sallyport Global Holdings, Inc. ("Old Sallyport"), a defense contractor providing security and base operations services. (*Id.*) The two began collaborating around April 2004, and by August 2004, Charron made DeBlasio an equal owner in and president of Old Sallyport. (A-__ (Tr. 1868:16-20).)

Through several subsidiary and affiliated entities—Sallyport Global Services ("SGS"), Sallyport Support Services, ("SSS"), and Sallyport Global Inc. ("SGI")— Old Sallyport supported the U.S. government's "contingency operations"—*i.e.*, short-term operations abroad—primarily in Iraq and Afghanistan. (A-__ (Tr.

---

[1] By stipulation and Order of this Court dated March 24, 2015, the parties will file a Deferred Appendix pursuant to Federal Rule of Appellate Procedure 30(c) after Appellee files his merits brief.

[2] "Tr." refers to the transcript of the trial proceedings on May 27-29, June 2-3, and August 4-6, 2014.

235:13-19).)  Roughly 85 to 90% of Old Sallyport's business came from support services in connection with the troop surges in Iraq and Afghanistan.  (A-__ (Tr. 225:18-226:10).)

As the troop drawdown in Iraq began in the Fall of 2009, DeBlasio and Charron looked into selling Old Sallyport.  (*Id.*)  They engaged consultants and investment banks to market Old Sallyport to third parties, but suitable buyers did not materialize because the asking price was simply too high.  (A-__ (Tr. 241:18-245:6).)  While DeBlasio was more willing to accept a lower price, Charron firmly believed the Company would garner between $80 million and $120 million.  (*Id.*; *see also* A-__ (Tr. 824:13-22).)  Potential buyers, however, viewed those prices as "excessive," and, through 2009 and 2010, no willing buyer offered to purchase Old Sallyport for more than $60 million.  (A-__ (Tr. 238:21-240:18); A-__ (Tr. 1138:11-1139:6).)

## B.     DeBlasio Buys Out Charron's Interest in Old Sallyport

By October 2010, with no third-party purchaser in the picture, Charron and DeBlasio began discussing the possibility of one partner buying out the other or of winding down the business.  (A-__ (Tr. 241:18-244:13).)  Ultimately, the two agreed that the company would repurchase Charron's 50% interest in the company, giving DeBlasio full ownership of and control over Old Sallyport.  Negotiations began in November 2010 with a goal of closing the transaction by the end of the

6

year.  (A-__ (Tr. 244:14-245:18).)  Both parties retained counsel:  Old Sallyport

was represented by WilmerHale, and Charron by Williams & Connolly LLP.  (A-

__ (Tr. 397:1-20); *see also* A-__ (Tr. 8:4-7).)

As negotiations progressed, DeBlasio and Charron agreed that the buyout

contract would contain a "windfall provision" to protect Charron in the event

DeBlasio sold Old Sallyport above a certain price within a certain time.  (A-__

(Ex.[3] R).)  If DeBlasio consummated such a transaction, he would pay Charron a

portion of the excess—or "windfall"—proceeds.   DeBlasio documented this

understanding in a November 30, 2010 email to Charron and the company's lawyer

at WilmerHale:

> I think the intent here is not to put a payment on the total
> purchase price in the future, but rather the incremental
> value beyond a normalized amount.  What I'm thinking
> is that the basic offer put forth to Tom as an internal
> transaction has a comparable valuation from an External
> buyer in 2011 of ~$66M.  In the event of a transaction in
> the next calendar year, he can share in a reasonable
> portion of anything above that amount.

(A-__ (*Id.* at SGH1-00229835).)  The lawyer then circulated proposed language:

> If, on or prior to [DATE], the Company consummates a
> transaction pursuant to which another person . . . would
> acquire  . . .  a majority or greater of the outstanding
> voting or other equity interest in the Company, then Mr.
> Charron would receive a cash payment equal to
> [PERCENT]% of the amount by which (A) the quotient

---

[3]   "Ex." refers to trial exhibits.

7

> of (1) the aggregate purchase price paid . . . in such transaction, divided by (2) the percentage interest of the Company being acquired . . ., exceeds two times the aggregate purchase price paid (or to be paid) to Mr. Charron in the [current transaction] . . . .

(A-__ (*Id.* at SGH1-00229834).) Charron replied to confirm how this approach would work. Less than an hour later, the lawyer circulated the following examples:

> If you sell to John for $50mm enterprise value (or $25mm for your 50%), then here are the results in two different scenarios, assuming for this illustration that the carry is 20%:
>
> Scenario 1: John sells the whole company for $100mm. You get 20% of $50mm, or $10mm. The math there is 20% of the amount by which (A) $100 / 100%, exceeds (B) two times $25mm. Simplifying, that's 20% of $100mm minus $50mm, or $10mm.
>
> Scenario 2: John sells 70% of the whole company for $60mm. You get 20% of [approximately $35mm, or $7.14mm]. The math there is 20% of the amount by which (A) $60mm / 70%, exceeds (B) two times $25mm. Simplifying again, that's 20% of $85,714,285 minus $50mm, or $7.14mm.

(A-__ (*Id.* at SGH1-00229832).)

This exchange confirms the parties' commonsense understanding that if DeBlasio sold Old Sallyport for more than the specified price, Charron would share in a percentage of the ***excess*** proceeds—that is, the amount that constitutes a windfall—and not a percentage of the ***entire*** purchase price. Charron never suggested a different understanding. While he claimed at trial that all along he

8

"wanted a provision that applied to all of the proceeds of a windfall sale," the District Court found that Charron's "credibility on this point [wa]s questionable, as it was the first time in the litigation that he mentioned it, and it appeared to conflict with deposition testimony that he did not recall discussing the windfall provision after the emails described above." *Charron v. Sallyport Global Holdings, Inc.*, No. 12-cv-6837 (WHP), 2014 WL 7336463, at *18 (S.D.N.Y. Dec. 24, 2014). The parties' lawyers continued to refine the language as they exchanged drafts from December 3-6, but the parties themselves engaged in no further discussions regarding the windfall provision. (A-__ (Tr. 250:6-251:10); A-__ (Tr. 864:4-14).)

Charron and Old Sallyport executed the final Stock Purchase Agreement (the "Charron Agreement"), on December 7, 2010. (A-__ (Ex. A).) Under the Charron Agreement, Old Sallyport redeemed Charron's 50% interest in the company in exchange for a broad release of liability and cash payments to Charron totaling nearly $41 million. (A-__ (*Id.* at § 2.02).) That price valued Charron's stock at $25 million and added half the cash on the company's balance sheet, less the value of the liability release (roughly $6 million) and the windfall protection. (A-__ (Tr. 245:7-246:7).)

The final Windfall Provision, set forth in Section 2.04 of the Charron Agreement, provides as follows:

> 2.04 <u>Windfall Protection</u>. As additional consideration for the Shares, the Company agrees to make an additional

9

> payment to Sellers, on the basis and subject to the limitations provided in this Section 2.04. If, on or prior to the first anniversary of the date hereof, John DeBlasio or any of his affiliates or any other direct or indirect equity holder sells or agrees to sell shares of the Company's capital stock (or equity of an intervening person or assets of the Company or any Company subsidiary) constituting 20% or more by voting power or economic value of the Company's assets or equity to a third party in one or a series of related transactions for a price that reflects an enterprise value of the Company equal to or greater than $65,000,000 (a "Windfall Sale"), within three Business Days following the closing of such Windfall Sale, the Company or such stockholder shall pay Sellers an amount equal to 20% of the proceeds received from the Windfall Sale, such payment to be made to Sellers pro rata in accordance with the percentages set forth on Schedule 1.

(A-__ (Ex. A, at 2-3).)

After the transaction closed, DeBlasio formed two trusts to pursue personal and charitable endeavors: the John DeBlasio Charitable Trust for World Peace and Development, later renamed the GPD Charitable Trust (the "Charitable Trust")—whose trustee is Defendant-Appellee JPD Private Trust Company, Ltd.—and the John DeBlasio Trust (the "Florida Trust"). (A-__ (Tr. 89:1-9); A-__ (Tr. 314:2-315:5); A-__ (Tr. 341:22-343:2).) DeBlasio ultimately donated his shares in Old Sallyport to the Charitable Trust. (A-__ (Tr. 313:21-314:19).)

## C.    DC Capital Acquires Old Sallyport for $64.5 Million

After buying out Charron, DeBlasio reconnected with several third parties that previously had declined to purchase Old Sallyport, informing them that he was

now Old Sallyport's sole stockholder and that he remained open to an acquisition. (A-__ (Tr. 312:24-313:19).)   A representative from DC Capital, which twice had considered but declined to buy Old Sallyport in 2009 and 2010, responded that DC Capital was interested.  (A-__ (Tr. 312:21-313:21).)

DeBlasio and DC Capital resumed discussions in early 2011.  DC Capital hired numerous professional advisors to conduct due diligence:  Spectrum Group to review Old Sallyport's business and customer relationships; Ernst & Young to review Old Sallyport's financials and taxes; Aon Consulting to review Old Sallyport's insurance coverage; and Arnold & Porter to conduct legal due diligence.   (A-__ (Tr. 1140:19-1141:19); A-__ (Ex. 64, at ALC00000158).) DeBlasio was advised by Cohen & Grigsby.  (A-__ (Tr. 325:9-10); *see also* A-__ (Ex. 351).)

On January 20, 2011, DC Capital sent DeBlasio a letter of intent stating that it was "prepared to pay $57,500,000 to purchase all outstanding stock of [Old] Sallyport on a cash free debt free basis."  (A-__ (Ex. X, at JD1-00002632).)   A "cash free, debt free basis," which is "the typical practice in private equity deals," meant that "DC Capital was purchasing the company only with enough working capital to continue operations, and it was expected that DeBlasio would remove the excess cash [and other non-operating assets] from the company."  *Charron*, 2014 WL 7336463, at *14.  The letter of intent also required DeBlasio to repurchase

between 40 and 49% of the post-acquisition company on the same terms as DC Capital, a structure known as an "equity rollover." (A-__ (Ex. X, at JD1-00002632).) In private equity transactions, "equity rollovers" secure the continued involvement and expertise of the company's management after an acquisition. (A-__ (Tr. 590:18-591:9).) As a DC Capital principal testified, this structure creates "an alignment of interest," "gives [the buyer] more confidence in past performance and future performance," and "keeps . . . continuity." (A-__ (Tr. 591:3-9).) In sum, it "[j]ust . . . makes good business sense." (*Id.*)[4]

In the following months, DeBlasio and DC Capital engaged in hard-fought, arm's length negotiations. Indeed, in March 2011, DeBlasio walked away when DC Capital requested that he shoulder DC Capital's indemnity obligations. (A-__ (Tr. 316:7-17).) The deal nearly collapsed, but in April DeBlasio came back to the negotiating table when DC Capital raised its offer to $64.5 million, in return for DeBlasio purchasing a 45% rollover equity share in the surviving company and temporarily setting aside part of the purchase price to cover potential liabilities. (A-__ (Ex. Y, at SGH1-00015000).) The parties continued to negotiate, and as DC Capital found additional third-party investors, the required rollover equity share

---

[4]   As part of its legal due diligence, Arnold & Porter advised DC Capital about any potential liability arising from the Charron Agreement. Arnold & Porter concluded that, as structured under the letter of intent, the transaction "does not appear to implicate [the Windfall Provision]." (A-__ (Ex. 74, at KCAP-002099).)

fell from 45% to 41%. (*Compare* A-__ (Ex. Y, at SGH1-00015000) *with* A-__ (Ex. B, at SGH1-00013964).)

DeBlasio and DC Capital ultimately executed a Securities Purchase Agreement on May 6, 2011, and amended it at closing on June 29, 2011 (the "DC Capital Agreement"). (A-__ (Ex. B); A-__ (Ex. C).) Under the DC Capital Agreement, DC Capital created a holding company, Sallyport Holdings, LLC ("New Sallyport"), which acquired DeBlasio's entire interest in Old Sallyport on a cash free, debt free basis. (*Id.*) In exchange, the Charitable Trust received $60.7 million in cash and the Florida Trust received a 38% rollover equity interest in New Sallyport in lieu of the additional $3.8 million.

The parties priced the rollover equity interest based on New Sallyport's debt-equity structure. Consistent with a typical leveraged buyout, DC Capital financed New Sallyport's purchase of Old Sallyport by causing New Sallyport to take on $54.5 million in debt. (A-__ (Tr. 85:1-8).) New Sallyport obtained the remaining $10 million through equity investments by DeBlasio, DC Capital, and other third-party investors. (A-__ (Tr. 86:17-87:8); A-__ (Ex. CI, at 5).) After the DC Capital Transaction, the total equity capitalization of New Sallyport was as follows:

| CLASS A EQUITY OWNERSHIP OF NEW SALLYPORT | | |
|---|---|---|
| **Equity Investor** | **Contribution** | **Equity Ownership** |
| Florida Trust (DeBlasio) | $3,800,000 | 38% |
| KS International Equity LLC (DC Capital entity) | $5,225,000 | 52.25% |
| Nick Gross | $475,000 | 4.75% |
| BNY Mellon-Alcentra Mezzanine III | $500,000 | 5% |
| **Total** | **$10,000,000** | **100%** |

(*See* A-__ (Ex. 296, at MCL-00000269); *see also* A-__ (Ex. CI, at 5).)

After DC Capital's revised offer in April, the total purchase price of $64.5 million and the rollover equity value of $100,000 for each percentage point of equity remained constant. For example, in the May 2011 version of the agreement, the parties contemplated that DeBlasio would receive $60.4 million in cash plus a 41% equity interest in New Sallyport in lieu of an additional $4.1 million. (A-__ (Ex. B, at SGH1-00013964).) Under the final terms, DeBlasio's rollover equity interest fell by 3% to 38%; correspondingly, the total value of that equity fell by $300,000 to $3.8 million, and the cash component of the transaction rose by $300,000 to $60.7 million. (A-__ (Ex. C, at TCHAR0009768).) DeBlasio had pushed to receive as much of the purchase price in cash as DC Capital would allow, but DC Capital resisted paying DeBlasio more cash unless and until it found additional third-party investors. (A-__ (Tr. 320:17-321:3).) When the DC Capital transaction closed in June 2011, DeBlasio received $60.7 million in cash paid to

14

the Charitable Trust (less indemnity obligations, holdbacks, and expenses), and 38% of New Sallyport, held by the Florida Trust. (A-__ (Ex. C., at TCHAR0009768).)

The transaction documents clearly reflect the parties' agreement. The DC Capital Agreement, as amended, provides that New Sallyport would purchase all of SGI's membership interests from the Florida Trust, as well as a portion of Old Sallyport's stock from the Charitable Trust. Old Sallyport would also redeem the balance of its stock from the Charitable Trust, leaving New Sallyport as the sole shareholder of both SGI and Old Sallyport. (A-__ (Ex. B, at recitals 3-4, SGH1-00013893); A-__ (Ex. C, at recitals 2-3, TCHAR000975450).) Section 2.2(a), as amended, sets forth the consideration New Sallyport paid for the SGI stock and the portion of Old Sallyport stock it directly purchased:

> The "Total Purchase Price" shall consist of the sum of (A) $6,200,000 (the "Base Purchase Price"), and (B) Membership Interests of [New Sallyport] delivered to [the Florida Trust] in accordance with Section 2.1(b) having an aggregate fair market value equal to $3,800,000 (which $3,800,000 shall be referred to as the "Contributed Stock Value)."

(A-__ (Ex. B § 2.2(a)).) Section 2.2(b) specifies the remaining consideration Old Sallyport paid the Charitable Trust to redeem its remaining stock:

> The "Redemption Purchase Price" shall equal $54,500,000, plus or minus any adjustment to the Redemption Purchase Price with respect to the Working Capital pursuant to Section 2.5.

15

(A-__  (*Id.* at § 2.2(b).)   Adding these amounts together, the total price of the transaction is $64.5 million.  (*Id.*; *see also* A-__ (*Id.* at Sch. 2.4).)

The DC Capital Agreement contained an integration clause providing that "[t]his Agreement and the other Transaction Documents supersede all prior negotiations, agreements and understandings among the parties hereto with respect to the subject matter of this Agreement and constitute the entire agreement among the parties hereto."  (*See* A-__ (*Id.* at § 13.4).)

A month after New Sallyport acquired Old Sallyort, New Sallyport merged with another DC Capital company, Kaseman Holdings LLC, to form KS International ("KSI").   Based on a negotiated merger ratio, DeBlasio's 38% rollover equity interest in New Sallyport became a 19.38% interest in KSI.  (A-__ (Ex. C ¶ 19); A-__ (Ex. CI); A-__ (Tr. 599:17-24).)

### D.   The Parties Exclude Excess Cash and Non-Operating Assets from the DC Capital Transaction

Consistent with the "cash free, debt free" structure of the deal, the parties to the DC Capital transaction did not count Old Sallyport's excess cash and other non-operating assets in the purchase price reflected in the DC Capital Agreement. Among the non-operating assets were two loans valued by the Court at $2.75 million owing to SGS from joint venture partners, the rights to which DeBlasio assigned from SGS to WD Solutions, another DeBlasio entity unaffiliated with Old Sallyport, before the DC Capital transaction closed.  (A-__ (Tr. 343:3-344:13); A-

16

__ (Tr. 1178:17-1180:5).)  SGS made the first loan in April 2011 to Arkel Sallyport Global Ltd. ("ASG"), a joint venture between SGS and Arkel International for a construction project in South Sudan.  (A-__ (Ex. 23).)  Using excess cash on hand, SGS agreed to provide a revolving loan to ASG to fund Arkel's participation in the joint venture.  (A-__ (Tr. 145:7-146:22).)  SGS made the second loan in 2011 to Power Generation Solutions, Ltd. ("PGS") to finance PGS's work on a power project in Afghanistan.  (A-__ (Ex. 91).)  Importantly, DeBlasio and DC Capital discussed these loans before the DC Capital transaction and agreed they were not operating assets of Old Sallyport.  DeBlasio did not consider these loans operating assets because they were made using SGS's retained earnings—which indisputably would have been disbursed to him at closing—and because any repayment would continue to accrue like an investment.  (A-__ (Ex. CG).)  DC Capital initially objected to the removal of these loans from Old Sallyport, but ultimately viewed them as separate from the operating agreements governing the respective joint ventures, with negligible operational or strategic value to New Sallyport going forward.  (A-__ (Tr. 1160:1-15); A-__ (Tr. 1178:17-1180:5).)  As such, the parties excluded the loans from the DC Capital transaction.

### E.    Proceedings Below

On September 12, 2012, Charron filed this action in the United States District Court for the Southern District of New York against DeBlasio, Old

17

Sallyport, and the JPD Private Trust Co., Ltd. The complaint asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual relations, fraud, conversion, unjust enrichment, quantum meruit, and civil conspiracy. (1st Am. Compl. at ¶¶ 101-177 (Dkt. #45).) Pre-trial motion practice disposed of all of Charron's claims except those for breach of contract and breach of the duty of good faith and fair dealing. (*See* April 22, 2013 Order (Dkt. #73).) Defendants asserted a counterclaim against Charron for civil theft, or in the alternative for conversion and unjust enrichment, arising from Charron misappropriating $227,364 in Old Sallyport funds just as DeBlasio was buying him out. (Ans., Affirmative Defenses, & Countercls. to Pl's 1st Am. Compl. at 26 -40 (Dkt. #77).)[5]

After an eight-day bench trial, the District Court found that Defendants had breached the Charron Agreement. *Charron*, 2014 WL 7336463, at *16. Despite the $64.5 million purchase price unambiguously reflected in the DC Capital Agreement, the District Court concluded that the "true value" of Old Sallyport was $81.7 million. *See id*. Although the District Court found that the $64.5 million price resulted from arm's length negotiations and did not involve fraud, *id.* at *6, the court nevertheless discarded that price for a mishmash of reasons.

---

[5]    This District Court found in favor of Defendants on their conversion and unjust enrichment counterclaims. *Charron*, 2014 WL 7336463, at *19-23. Charron has not cross-appealed that ruling or any other portion of the judgment below.

18

*First*, the District Court believed that DeBlasio and DC Capital could manipulate the value of DeBlasio's 38% rollover equity at will without "affect[ing] the economics of the deal," even though third-party investors also bought equity in New Sallyport on identical terms. *Id*. at *5. *Second*, the Court cited remarks by Old Sallyport's lawyers about the rollover equity in unrelated litigation, while ignoring DeBlasio's explanation for those remarks. *Id.* at *6. *Third*, the Court noted that one Sallyport entity, SGI, had no value apart from its affiliation with Old Sallyport. *Id.* at *7. *Fourth*, the Court relied on irrelevant differences in the prices the parties assigned to different portions of Old Sallyport's stock. *Id*. *Finally*, the District Court determined that the $64.5 million price was too low if certain valuations of Old Sallyport by DC Capital and third parties were accurate. *Id.* at *7-9.

After casting aside the $64.5 million purchase price negotiated and agreed to by the parties in the DC Capital Agreement, the District Court performed its own judicial revaluation of DeBlasio's rollover equity interest, and found that it was worth $18,286,578. *Id*. at *12. The District Court also considered the $2.75 million in transferred loans as part of the deal price. The District Court reasoned that, notwithstanding DeBlasio and DC Capital's view that the loans were equivalent to excess cash, they provided an arguable strategic benefit to the company by increasing its "geographic reach," and therefore were operating assets.

19

*Id.* at *12-14. Adding this $2.75 million to the $60.7 million in cash and the re-valued rollover equity, the Court found that DeBlasio actually received $81,736,578 in the proceeds from the DC Capital transaction. *Id*. at *16.

Compounding these errors, the District Court then held that the Charron Agreement unambiguously entitled Charron to 20% of the ***total*** value of the DC Capital transaction as damages, rather than 20% of the "windfall" amount in ***excess*** of $65 million. *Id.* at *16. The Court acknowledged that this result was "seemingly counterintuitive" and economically implausible, that DeBlasio wanted and intended for the 20% provision to apply to proceeds over $65 million, that negotiations and drafting were rushed, and that Charron's testimony offering an alternative explanation for the provision was not credible. But the District Court refused to reform the contract based on mutual mistake. *Id.* at *17-18.

The Court awarded Charron $16,347,315.60 in compensatory damages, with pre-judgment interest of $5,139,327.27. After setting off from those amounts the damages owed by Charron to Old Sallyport on its counterclaims, the Court entered judgment in favor of Charron in the amount of $21,203,814.27. (Judgment (Dkt. #266.)

## SUMMARY OF ARGUMENT

***First***, the DC Capital transaction did not trigger the Windfall Provision because the terms of the DC Capital Agreement, negotiated at arm's length by

20

sophisticated and well-advised businessmen, unambiguously provide that DeBlasio sold the entire company for a price of $64.5 million, less than the $65 million threshold. By ignoring this negotiated *price*, and instead performing its own analysis of the *value* of DeBlasio's rollover equity shares, the District Court rewrote the terms of two separate agreements and sewed chaos into the accounts of every participant in the transaction, including third-party investors. The court then compounded this error by adding in $2.75 million in non-operating loans assigned from Old Sallyport to DeBlasio before closing, even though the parties agreed that the loans were equivalent to excess cash and DC Capital was buying Old Sallyport on a "cash free, debt free" basis.

*Second*, even if the DC Capital transaction triggered the Windfall Provision—and it did not—that provision only entitled Charron to 20% of the excess sale proceeds over $65 million. When read in context, the text of the Windfall Provision unambiguously provides that the 20% multiplier applies only to the amount that would constitute a "windfall"—*i.e.*, the amounts over the $65 million threshold. To the extent the clause is ambiguous, overwhelming extrinsic evidence shows that the parties intended the 20% to apply to the excess proceeds over $65 million, and not to all of the proceeds received in a sale above $65 million. At a minimum, the District Court erred in refusing to reform the Windfall Provision to reflect the parties' mutual intent. By awarding Charron 20% of the

21

total sale proceeds it already had inflated erroneously, the Court gave Charron—who indisputably received over $41 million for his half of the company—an additional $21 million windfall the parties never contemplated.

To vindicate the cardinal rule that courts must honor commercial contracts as the parties write them, this Court should vacate the decision below and remand with instructions to enter judgment for Defendants on Charron's claims.

## STANDARD OF REVIEW

This Court reviews a district court's interpretation of contractual language, including its determination of whether language is ambiguous, *de novo*. *Collins v. Harrison-Bode*, 303 F.3d 429, 432 (2d Cir. 2002). This Court reviews findings of fact, including findings about the intent of contracting parties, for clear error. *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 528 (2d Cir. 2004); *Healy v. Rich Prods. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992).

## ARGUMENT

## I. THE DC CAPITAL TRANSACTION DID NOT TRIGGER THE WINDFALL PROVISION BECAUSE DEBLASIO SOLD OLD SALLYPORT FOR LESS THAN $65 MILLION

This should have been a straightforward case. Everyone agrees that if DeBlasio sold his entire interest in Old Sallyport for less than $65 million, he owes Charron nothing under the Windfall Provision. And everyone agrees that the plain terms of the DC Capital Agreement provide that DeBlasio sold his entire interest in Old Sallyport on a cash free, debt free basis for $64.5 million—$60.7 million in

22

cash, plus a 38% rollover equity interest in New Sallyport in lieu of an additional $3.8 million. In the absence of fraud or other misconduct, which the District Court did not find occurred here, that should end the matter. "[C]ourts may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992) (internal citations omitted). Instead, courts in this Circuit are bound to enforce contracts' express written terms—even if doing so might lead to inequitable results (which it would not here). *See U.S. Trust Co. of N.Y. v. Alpert*, 10 F. Supp. 2d 290, 303 (S.D.N.Y. 1998), *aff'd sub nom. U.S. Trust Co. of N.Y. v. Jenner*, 168 F.3d 630 (2d Cir. 1998); *Diversified Mortg. Investors, v. U.S. Life Title Ins. Co. of N.Y.*, 544 F.2d 571, 575 (2d Cir. 1975).

Disregarding these bedrock principles, the District Court instead looked behind the DC Capital Agreement, concluding that the rollover equity was "really" worth a startling $18.3 million and that the $2.75 million in assigned loans were "really" operating assets that should have been included in the purchase price. By substituting its own judgment in place of the agreement of the contracting parties, the District Court erred as a matter of law.

### A. DeBlasio and the Charitable Trust Received $64.5 Million for the Sale of Old Sallyport

Under the Windfall Provision, DeBlasio owes Charron nothing unless he sells his entire interest in Old Sallyport for a "price" of $65 million or more, or part of his interest for a similar pro rata price. In the words of the Windfall Provision, Charron is entitled to payment only if DeBlasio "agrees to sell shares . . . constituting 20% or more by voting power or economic value of the Company's assets or equity . . . for *a price* that reflects an enterprise value of the Company equal to or greater than $65,000,000." (A-__ (Ex. A § 2.04)) (emphasis added). The plain meaning of the term "price" is "[t]he amount of money or other consideration asked for or given in exchange for something else; the cost at which something is bought or sold." Black's Law Dictionary 1380 (10th ed. 2014). Here, as set forth in the clear and unambiguous terms of the DC Capital Agreement, DeBlasio sold 100% of Old Sallyport's equity for a "price" of $64.5 million.

Because DeBlasio sold the entire company, the "price" DC Capital paid in an arm's length transaction reflects the total "enterprise value" of the company. The phrase "reflecting an enterprise value" in the Windfall Provision would be relevant only if DeBlasio sold less than 100% of Old Sallyport. If, for example, DeBlasio had sold only 50% of Old Sallyport's equity for $35 million, keeping the

remaining 50% for himself, then that transaction would reflect an implied "enterprise value" of $70 million.

The DC Capital Agreement makes exceedingly clear that the "price" DeBlasio received for 100% of Old Sallyport was $64.5 million. Contrary to the District Court's suggestion that "the DC Capital deal documents do not adequately capture the transaction," *Charron*, 2014 WL 7336463, at *8, the DC Capital Agreement captures precisely the deal DeBlasio and DC Capital bargained for and the deal to which they agreed. Section 2.2 sets forth the consideration DeBlasio received: $60.7 million in cash plus $3.8 million worth of rollover equity, for a total of $64.5 million. (A-__ (Ex. B § 2.2); A-__ (Ex. C ¶¶ 9-10).) Stated differently, DeBlasio received a total of $64.5 million, but DC Capital required him to use $3.8 million of those sales proceeds to purchase a 38% equity interest in New Sallyport (later converted to a 19.38% equity interest in KSI).

While the mixture of cash and rollover equity changed as negotiations progressed, the total price never wavered after DC Capital in April 2011 increased its offer from $57.5 million to $64.5 million. Indeed, the changes in the cash-equity mixture confirm that the $64.5 million total price was genuine, and that each percentage point of rollover equity directly corresponded to $100,000 of forgone cash. In May 2011, the parties initially agreed that DeBlasio would receive $60.4 million in cash and a 41% rollover equity share in New Sallyport in lieu of an

additional $4.1 million. When DC Capital found additional third-party investors, the parties agreed that DeBlasio would receive $300,000 more in cash ($60.7 million), and $300,000 less in rollover equity (38% in lieu of $3.8 million). In all events, the total purchase price was always $64.5 million—no more, no less.

As the District Court recognized, the $64.5 million price was not fraudulent; in fact, it was the product of months of negotiations so heated the deal nearly collapsed at one point. The parties consulted legions of accountants, lawyers, and other advisors to assess and allocate the conceivable risks. As such, the District Court should have adhered even more strictly to the maxim that a court will not rewrite the terms of a clear contract where it is "negotiated between sophisticated, counselled business people negotiating at arm's length," especially in industries where "commercial certainty is paramount." *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004). There simply is no evidence that DC Capital ever offered or was willing to pay more than $64.5 million.

## B. There is No Legitimate Basis to Re-Value the 38% Rollover Equity in New Sallyport

By looking to its own assessment of the "value" that DeBlasio and the Charitable Trust supposedly received in the DC Capital transaction instead of the parties' agreement on the "price," the District Court effectively rewrote both the Charron Agreement and the DC Capital Agreement. Whether or not what DC Capital paid fairly reflected Old Sallyport's "true value" is immaterial. The

26

supposed "true value" of the rollover equity cannot change the fact that the "price" DC Capital paid for Old Sallyport—and the amount of money the Charitable Trust and the Florida Trust received—was $64.5 million.

A recent decision from the Southern District of New York, affirmed by this Court, is instructive. In *Cordell v. McGraw-Hill Companies*, an author (Cordell) entered into a publishing agreement calling for McGraw-Hill to distribute a book in exchange for royalties: 10% of McGraw-Hill's net receipts for each copy of the book sold to the McGraw-Hill international book division or to third parties for use outside the United States. No. 12 Civ. 0637 (ALC) (RLE), 2012 WL 5264844, at *1 (S.D.N.Y. Oct. 23, 2012), *aff'd*, 525 F. App'x 22, 23 (2d Cir. 2013). After McGraw-Hill paid Cordell royalties based on internal transactions between McGraw-Hill and its international division (rather that on that division's subsequent sales to third parties outside the United States), Cordell sued claiming that the agreement required McGraw-Hill to pay him royalties based on the actual sales to ultimate third parties. In other words, Cordell claimed he was entitled to royalties on the market value of the transaction—not on the intra-company transfer at a lower, below-market price. *Id*. at *2.

The court rejected that argument, holding that nothing in the contract suggested that a "sale" upon which the royalty was to be based had to occur at a certain minimum price. *Id.* at *3. Rather, McGraw-Hill was fully within its rights

27

to structure the deal so as to sell Cordell's work to an internal division at a below market price, base the royalty off of that price, and then go on to sell the work on the open market at a market price. *Id*. As the court held, "it would strain a plain reading of the Agreement to require that sales be made at market rate, or that sales to the different type of buyers be at the same rate." *Id*. This Court agreed, and affirmed.

A similar analysis should have controlled here. The Windfall Provision applies if DeBlasio sold Old Sallyport for a "price" equal to or exceeding $65 million. He sold Old Sallyport to DC Capital for a "price" of $64.5 million. That price was negotiated at arm's length without any fraud or other misconduct, as the District Court correctly found. The Charron Agreement did not require DeBlasio to sell Old Sallyport for any minimum amount, nor did it mandate that any sale must reflect fair market value. The "price" agreed to by the parties thus controls.

By accepting extrinsic testimony on what others believed the consideration for Old Sallyport *should have been*, rather than the consideration DeBlasio *actually received*, the District Court effectively rewrote the Windfall Provision to say that any purchase price would be subject to an independent valuation. One certainly could imagine such language; Charron and DeBlasio could have agreed that Charron would be entitled to "windfall" proceeds if DeBlasio sold shares in Old Sallyport "for a *fair market value* that reflects an enterprise value of the

28

Company equal to or greater than $65,000,000, **_as independently verified by a neutral third party valuation expert of national reputation_**."  But that was not the parties' deal; indeed, the District Court explicitly recognized that "DeBlasio and DC Capital were well within their rights to ensure that the transaction did not trigger the windfall protection clause."  *Charron*, 2014 WL 7336463, at *6.

The District Court may not have liked the results that flowed from enforcing the plain terms of the Charron Agreement, but courts cannot "redraft a contract to accord with [their] instinct for the dispensation of equity upon the facts of a given case."  *Cruden*, 957 F.2d at 976; *see also U.S. Lines (S.A.), Inc. v. United States (In re McLean Indus., Inc.)*, 162 B.R. 410, 421 (S.D.N.Y. 1993), *overruled on other grounds*, 30 F.3d 385 (2d Cir. 1994).  While the District Court did not explicitly invoke its equitable powers, the tone of the opinion suggests that the Court was motivated by a desire to effect what it viewed as a fairer outcome.  The first sentence of the opinion frames the dispute as a "divorce," and its conclusion marries that description with a reference to the "War of the Roses."  *Charron*, 2014 WL 7336463, at *1, *23.  Elsewhere the District Court expressed its disappointment that "DeBlasio never informed Charron of the DC Capital transaction.  Instead, Charron's lawyer had to contact DeBlasio's lawyer to ask if [Old Sallyport] had been sold."  *Id*. at *6.

In reality, the District Court got the equities backward. Charron already received $41 million for his half of Old Sallyport, stole almost another quarter million dollars on his way out the door,[6] and gave self-serving trial testimony about the Windfall Provision that flatly contradicted his earlier deposition testimony. Yet the District Court gave Charron a multi-million dollar windfall at the Charitable Trust's expense. Indeed, the over $21 million the District Court awarded Charron constitutes a third of everything that DeBlasio did or ever will receive from the sale of Old Sallyport—a result that no party ever contemplated. In any event, whatever the District Court's view of the parties may have been, it should have had no bearing on the Court's duty to honor the plain terms of the contracts at issue.

Notably, the decision below not only worked an inequity upon the Charitable Trust and DeBlasio, but also upended the settled expectations of third parties who invested in New Sallyport alongside DeBlasio and DC Capital. The District Court recognized that "[p]erhaps the best evidence Defendants presented

---

[6] Before executing the Charron Agreement on December 7, 2010, Charron caused Old Sallyport to issue several checks to himself without informing DeBlasio and without following established procedures for doing so. The District Court found that these "unilateral and secret withdrawals" constituted a "conversion and unjust enrichment" and were "choreographed actions . . . designed for one purpose: to conceal from SGH and DeBlasio that he was taking an extra $227,364.22 out of the company coffers." *Charron*, 2014 WL 7336463, at *22-23. Those findings of the District Court are unchallenged.

indicating that the value of the rollover equity was in fact $3.8 million was the claim that other investors paid the same per share price for equity in New Sallyport." *Charron*, 2014 WL 7336463, at *9. Just like DeBlasio, each of those third-party investors purchased equity in New Sallyport at a price of $100,000 for each one percent interest. Under the District Court's theory, these investors got the deal of the century—they bought shares in New Sallyport at a mere fraction of their value.

The District Court nonetheless disregarded the interests of these third-party investors, including Bank of New York Mellon, on the flimsy ground that some (but not all) of them also received fees in connection with the transaction. The District Court pointed to no evidence—and there was none—that those investors did not actually ***earn*** those fees by rendering services pursuant to valid agreements. Nor was there anything nefarious about the fact that DC Capital gave Nick Gross, an Old Sallyport executive, a $475,000 loan to cover his equity contribution to New Sallyport. *Id.*; (A-__ (Ex. 327, at KCAP-010154)). The unremarkable fact that economic interests flowed both ways in a private equity transaction does not change the fact that these investors all had a common economic understanding of the value of their interests in New Sallyport.

The consequences of ignoring the interests of New Sallyport's other investors are far-reaching and unsettling. The decision below posits a kind of

financial alchemy whereby $10 million in equity somehow magically transformed into almost $50 million simply by being invested in a leveraged buyout. That fantastical proposition creates a paradox whereby DeBlasio's equity interest in New Sallyport is valued for purposes of this litigation one way, while the original, agreed-upon valuation as between the investors in New Sallyport is left untouched. But those two alternative realities cannot be squared. If DeBlasio's 38% interest in New Sallyport really was worth $18.3 million rather than $3.8, do DC Capital and the other investors have to restate their financials to match? If offsetting fees render the investors' equity contributions unreliable, what is the tax basis for each of their stakes in New Sallyport? Could the deal architects face fiduciary or other legal claims for giving away equity shares that were worth almost five times what third-party investors paid for them? What about the investors in Kaseman, with which New Sallyport later merged to form KSI (and which remains a going concern)? If New Sallyport is worth what the District Court's decision implies it is worth, is Kaseman's interest in KSI correspondingly diluted? Or is Kaseman's interest in KSI also worth multiples of what it purchased that interest for, giving Kaseman's investors the deal of the century as well? These unanswered questions refute the District Court's suggestion that "[a]fter agreeing to pay $60.7 million in cash and 38% of the acquiring entity, any value 'assigned' to the equity stake would not affect the economics of the deal." *Charron*, 2014 WL 7336463, at *5.

32

That statement is demonstrably untrue and the collateral consequences of the District Court's decision—on New Sallyport's capital structure, debt structure, distributions to shareholders, and other obligations—are precisely why courts properly are loathe to disturb commercial transactions. *See McLean Indus.,* 162 B.R. at 420-21.

The other reasons the District Court gave for disregarding the negotiated $3.8 million value of the rollover equity interest fare no better. For example, the District Court relied heavily on a statement by Old Sallyport's lawyers in unrelated litigation against its onetime investment bank, Sagent Advisors, to the effect that because DeBlasio obtained a 38% voting stake (or a 35.91% total stake) in New Sallyport, the DC Capital transaction resulted in DeBlasio "selling 64.09% of [Old Sallyport's] capital stock" for $60.7 million in cash. *Charron*, 2014 WL 7336463, at *6-7 (quoting A-__ (Ex. 22, at SAG00025464)). "Obviously, if DeBlasio sold 64.09% of [Old Sallyport]'s stock for $60.7 million, the transaction reflected a total enterprise value of well over $65 million." *Id* at *7. But economically, that description of the transaction would be accurate only if a 35.91% stake in New Sallyport was equivalent to a 35.91% stake in Old Sallyport. And the two companies were in no way equivalent; while Old Sallyport was debt-free, New Sallyport was laden with the $54.5 million in debt it had to borrow to finance the transaction. As DeBlasio testified, "[New Sallyport] is equal to [Old Sallyport]

33

*plus the debt, which is a negative value*. . . . [Y]ou have to put the debt there." (A-
__ (Tr. at 89:23-90:14) (emphasis added).)  For that reason, DeBlasio explained
that the statement from the Sagent litigation was "overly aggressive" and "a
mistake." (A-__ (Tr. at 96:17-97:20).)  But the District Court simply ignored that
explanation.

The District Court also lost the forest for the trees by pointing to irrelevant
transaction details divorced from their larger context.  The Court made much of the
fact that the Florida Trust received the 38% rollover equity interest in exchange for
its ownership of SGI, a shell entity with no contracts or assets apart from its
affiliation with Old Sallyport.  But the fact that one part of the transaction might
seem economically irrational in isolation is unremarkable and meaningless.
Everyone involved—the parties, the accountants, even Charron's own damages
expert—treated the sale of SGI as an integrated part of a single effective
transaction involving Old Sallyport and all of its subsidiary and affiliated entities.
(A-__ (Tr. 318:-8-319:14); A-__ (Tr. 628:7-14); A-__ (Tr. 658:7-18); A-__ (Tr.
975:13-977:9); A-__ (Tr. 1154:15-1155:1); A-__ (Ex. 98, Risius Report at 4 ¶ 2
n.1).)  Equally irrelevant is the fact that the parties assigned different pro rata
values to the Old Sallyport stock the company redeemed and the stock New
Sallyport directly purchased. The Charitable Trust received $60.7 in cash and the
Florida Trust received a 38% rollover equity interest in exchange for all of the

stock of Old Sallyport and SGI. How much was received for different particular shares simply does not matter.

Perhaps most egregiously, the District Court found the $64.5 million price unreliable because it was lower than certain valuations performed by DC Capital and other third parties. The evidence overwhelmingly showed that these projections were untrustworthy. Indeed, the District Court acknowledged that "[t]he refrain at trial" was that the DC Capital projections—on which the District Court most heavily relied—"were optimistic and everyone knew it." *Charron*, 2014 WL 7336463, at *8. But more fundamentally, it was not the District Court's place to decide that "$10 million was an unrealistically low prediction of [Old Sallyport]'s future [revenue]" or that "$64.5 million was too good a price to be true." *Id.* DeBlasio decided that $64.5 million was a fair price, and that is what DC Capital paid him. Nothing else matters.

The District Court's rule has no logical limit. If misleading statements from unrelated litigation, decontextualized transaction details, and inflated revenue projections are enough to set aside the express terms of an integrated agreement negotiated between sophisticated parties, then contracts have become meaningless and chaos will reign. While the District Court was led to believe that the transaction was suspect because of "the way the deal was structured," *id.* at *6, it is precisely because, like most private equity transactions, this one had an interrelated

35

and complex structure that the District Court's decision to revalue just one slice of it was wrong as a matter of law.

### C. The $2.75 Million in Assigned Loans Were Non-Operating Assets

Just as the parties to the DC Capital transaction agreed that the total price of the transaction was $64.5 million, they also agreed that $2.75 million in outstanding loans Old Sallyport had made to ASG and PGS were not part of that "price." Rather, they were non-operating assets equivalent to excess cash on Old Sallyport's books, and therefore properly belonged to DeBlasio under the cash free, debt free structure of the transaction. The District Court's decision to treat these loans as part of the "price" of the DC Capital transaction, and therefore part of the proceeds "received from the Windfall Sale," was wrong because it ignores both the parties' agreement and the settled definition of an operating asset.

DeBlasio and DC Capital discussed the $2.75 million in loans at length and agreed that they were non-operating assets equivalent to excess cash. That agreement was entirely sensible—as even Charron conceded at trial, Old Sallyport was not a bank and it was not in the business of offering credit. (A-__ (Tr. 544:19-22).) The loans were simply an opportunistic investment—a convenient place to store some of the company's considerable retained earnings. (A-__ (Tr. 141:20-149:22); A-__ (1157:12-15); A-__ (Tr. 1158:12-1159:3).) If DC Capital believed that these loans had any operational or strategic value to the company going

36

forward, it had every incentive to object and keep the loans on Old Sallyport's books. Indeed, DC Capital did object initially, but eventually realized that the loans were separate from the joint ventures they had helped fund, and were functionally no different than excess cash sitting in an Old Sallyport bank account. The parties therefore agreed to allow DeBlasio to assign the loans to another entity he controlled before the transaction closed. That is also why neither party believed that allowing DeBlasio to continue to operate these loans apart from New Sallyport would violate the non-competition clause in the DC Capital Agreement that bound DeBlasio not to engage in activities that compete with the business of New Sallyport. (A-__ (Ex. B § 5.01); A-__ (Tr. 343:13-344:12).) Simply put, the District Court had no basis to second-guess the parties' agreement as to the treatment of these loans.

But even if it were proper for the District Court to look behind the parties' agreement, the decision to treat the loans as part of the "price" of the DC Capital transaction was still wrong. At trial, the parties agreed that the loans could not be included in the "price" of the DC Capital transaction unless they were "operating assets." (A-__ (Tr. 1313:19-22); A-__ (Tr. 1760:2-17).) Operating assets consist of a company's total assets minus its surplus assets, which in turn are defined as "[a]ssets that could be sold or distributed without impairing company operations." *Merion Capital L.P. v. 3M Cogent, Inc.*, No. 6247-VCP, 2013 WL 3793896, at *17

37

(Del. Ch. July 9, 2013) (quoting Shannon Pratt & Roger Grabowski, *Cost of Capital: Applications and Examples* 203 (4th ed. 2010)).

Here, there was no evidence that the sale or distribution of the loans would have impaired Old Sallyport's operations. Indeed, quite to the contrary, New Sallyport has functioned as a successful going concern for nearly four years without them, just as DeBlasio and DC Capital anticipated. But rather than asking whether the removal of these loans would have impaired Old Sallyport's operations, the District Court instead asked the wrong question—namely, whether the loans provided any conceivable strategic benefit to Old Sallyport. Even worse, the District Court then answered that question in the affirmative by pointing solely to Charron's self-serving testimony that the loans benefitted Old Sallyport by allowing it show a track-record of projects in certain regions, without any evidence that DeBlasio, DC Capital, or anyone else shared that view.[7]

The question is not, as the District Court held, whether the loans potentially could have "advanc[ed] [Old Sallyport's] business." *Charron*, 2014 WL 7336463,

---

[7] While the District Court cites to testimony from DeBlasio in support of the proposition that establishing a presence in Africa was important for Old Sallyport, *Charron*, 2014 WL 7336463, at *13, the cited testimony does not support the notion that the loans made to AGS and SGS were operating assets. Rather, DeBlasio's testimony was that the joint ventures with AGS and SGS helped develop Old Sallyport's business in these new regions, but that the loans were merely side deals that had no operational impact on the joint ventures going forward. (A-__ (tr. 139:8-140:3); A-__ (Tr. 153:2-12); A-__ (Tr. 344:1-12).)

*13.  The proper question is whether their absence would have impaired Old Sallyport's business.  *Merion*, 2013 WL 3793896, at *17.  They did not, and there is no evidence that they did.  As such, the District Court erred by including the $2.75 million in loans in its judicial revaluation of the DC Capital transaction.

## II.    THE WINDFALL PROVISION ONLY ENTITLES CHARRON TO 20 PERCENT OF THE EXCESS PROCEEDS OVER $65 MILLION

If this Court honors the Charron and DC Capital Agreements as written and holds that the "price" of the transaction was $64.5 million, as DeBlasio and DC Capital agreed, Charron's claim fails, and this case is at its end.  But even if the "price" of the deal somehow exceeded the $65 million threshold necessary to trigger the Windfall Provision, Charron is entitled to only a fraction of the damages the District Court awarded him.  The text, negotiating history, and clear mutual intent of the Windfall Provision limit Charron's recovery to 20% of the excess proceeds over $65 million—*i.e.*, the portion of the proceeds that would represent a "windfall."

### A.    The Text of the Windfall Provision Limits Charron's Windfall Protection to 20 Percent of the Excess over $65 Million

Read in its full context with an eye to its purpose, the text of the Windfall Provision unambiguously requires DeBlasio to pay Charron 20% of only the amount DeBlasio received over $65 million.  It is the law in New York (whose law

39

governs the Charron Agreement) that in order to ascertain the meaning of a particular contractual provision, a court must

> examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought.

*Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) (quoting *Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524 (1927)). "Where the document makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement." *Id.* at 554 (quoting *William Press, Inc. v. State*, 37 N.Y.2d 434, 440 (1975) (internal brackets and quotation marks omitted)).

Here, the use of the term "windfall" in the Charron Agreement clearly reflects Charron and DeBlasio's mutual intention to allow Charron to share only in the amount in excess of $65 million. By its plain meaning, a "windfall" occurs only when an individual receives "[a]n unanticipated benefit, usu[ally] in the form of a profit and not caused by the recipient." Black's Law Dictionary 1835 (10th ed. 2014). In this case, only the portion of a subsequent sale that exceeded $65 million could have amounted to a windfall to DeBlasio because, by the textbook definition of that term, it would be the portion that could fairly be unanticipated.

40

(A-__ (Ex. A § 2.04); *see also* A-__ (Tr. 866:12-16 ("Windfall means above and beyond the ordinary. Okay. So what we always meant by windfall was that was the increment above 65 million.")); A- __ (Tr. 903:21-907:6).) Indeed, that Charron received $25 million in exchange for his 50% interest in the Company suggests that he and DeBlasio valued the Company at $50 million in December of 2010.[8] (A-__ (Ex. A, §2.02); A-__ (Ex. T, at JD1-00011867).)

Charron's interpretation, adopted by the District Court—granting Charron 20 percent of the ***entire*** purchase price in a sale just 6 months later—simply discards the settled meaning of the word "windfall." Instead, it produces the counterintuitive result of compensating Charron a second time for his former ownership interest in Old Sallyport by allowing him to partake in a portion of the purchase price that neither he, DeBlasio, nor anyone else would consider a "windfall." That result is inconsistent with the language in the contract granting Charron "Windfall Protection," as well as the dominant purpose of the Charron

---

[8] While Charron ultimately received $40.7 million in connection with the transaction, the amount above $25 million consisted of Old Sallyport's excess cash that Charron and DeBlasio split upon closing. (*See* A-__ (Tr. 245:7-246:7); A-__ (Ex. T at JD1-00011868).) Consistent with that view of the company's value, in mid-2010 Charron retained an accountant to value his interest in Old Sallyport for estate planning purposes, and the accountant estimated the company's enterprise value as of July 2010 as $52,216,466. (A-__ (Tr. 940:24-942:15).)

41

Agreement, which was to effectuate a final parting of the ways between Charron and DeBlasio.

The District Court's interpretation of the Windfall Protection provision also produces results that are economically absurd. "Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 104 (2d Cir. 2006) (quoting *World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003)); *Vertical Indus. Park Assocs. v. United Merchants & Mfrs., Inc. (In re United Merchants & Mfrs., Inc.)*, 623 F.2d 804, 807 (2d Cir. 1980) ("A contract should be read, whenever possible, to achieve a result that is fair and sensible, not one that is harsh and inexplicable."); *see also* 11 *Williston on Contracts* § 32:11 (4th ed. 2014). If the District Court's interpretation is affirmed, Charron would receive more than a "Windfall Protection;" he would be granted an exacting penalty on DeBlasio. The District Court recognized this absurd result when it noted that, under the interpretation it adopted, DeBlasio would receive less from a sale between $65 million and $81.25 million than he would if he sold for a dollar less than $65 million. *Charron*, 2014 WL 7336463, at *17. There is no indication in the agreement that the parties contemplated such a draconian measure that would create a disincentive for DeBlasio to sell the company to a third party for the highest price it could garner.

42

The New York Appellate Division's decision in *Tougher Heating &*
*Plumbing Co. v. State*, 73 A.D.2d 732 (3d Dep't 1979), is instructive. There, a
contractor entered into a construction contract with the state of New York whereby
the contractor received certain incentive payments to keep labor costs down. *Id.* at
732. Specifically, the contract provided that if contractor's labor costs "equal[ed]
or exceed[ed] $2,550,000," the contractor would receive $2,650,000 from the state,
and if "such costs d[id] not equal $2,550,000, the contractor shall be entitled to
50% of the difference between such actual costs and $2,550,000." *Id.* at 732-33.
The contractor's costs at the end of the project totaled $1,779,106.44, and the State
paid it 50% of the difference between that number and $2,550,000, but not the
additional $100,000. *Id.* at 733. The Court of Claims found the state liable for
breach of contract. *Id.*

Affirming the Court of Claims decision, the Third Department found that the
State's interpretation produced an absurd result clearly out of line with the
intention of the contract to induce the contractor to keep labor costs down:

> To take an example posited by the Court of Claims,
> according to the State's interpretation of the modification
> agreement, if the labor costs were $2,549,000, the
> contractor would be entitled only to $500 and would be
> deprived of the $100,000 to which he would be entitled if
> the labor costs equal $2,550,000. We agree with the
> Court of Claims that this was not the intention of the
> parties; it leads to a totally absurd result.

*Id*.

43

Just like the State's reading of the contract in *Tougher Heating*, the District Court's interpretation of the Windfall Provision produces an absurd penalty. The context of the Windfall Provision gives no indication that the parties intended to penalize DeBlasio for selling the company to a third party between $65 million and $81.25 million. To the contrary, just as the parties in *Tougher Heating* wanted the contractor to keep labor costs as low as possible, DeBlasio and Charron both wanted DeBlasio (if he were to sell the company) to fetch the highest price possible, maximizing the payout to both of them. In both cases, the purpose of the clause was not to penalize one party, but to align the parties' interests and to allow both parties to share in a potential windfall. As in *Tougher Heating*, the only logical reading of the Windfall Provision, and the one the parties intended as evidenced by the language of the contract, is that Charron was entitled to a percentage of the portion of the purchase price that represented a *windfall—i.e.*, the amount over $65 million.

### B. Extrinsic Evidence Confirms the Parties' Intent to Limit Charron's Windfall Protection to 20 Percent of the Excess over $65 Million

The plain language of the Windfall Provision alone establishes that Charron is entitled to no more than 20% of the windfall sale proceeds over $65 million. But to the extent the Court finds the language ambiguous and considers extrinsic evidence, overwhelming evidence from the Windfall Provision's negotiation

44

history shows that the parties only intended it to grant Charron a share of the excess sale proceeds over $65 million.

"[W]here the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). Where that is the case, this Court "may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) (quoting *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746-47 (2d Cir. 1999)). Here, all credible evidence supports DeBlasio's reading of the Windfall Provision and none supports Charron's.

**First**, the only documentary evidence concerning the meaning of the Windfall Provision strongly indicates that the parties understood that it would apply only to the amount above $65 million. As explained above, when Old Sallyport's lawyer circulated a template windfall provision, DeBlasio replied, copying Charron, explaining that "the intent here is not to put a payment on the total purchase price in the future, but rather *the incremental value beyond a normalized amount*. . . . In the event of a transaction in the next calendar year, [Charron] can share in a reasonable portion of anything *above that amount*." (A-

45

__ (Ex. R at SGH1-00229835) (emphasis added).) The lawyer then proposed language that, while somewhat convoluted, unambiguously limited Charron to a percentage of the excess sale proceeds. (A-__ (*Id.* at SGH1-00229834).) When Charron asked for an explanation for how the provision would work, the lawyer gave examples that again unambiguously limited Charron to a percentage of the excess sale proceeds. (A-__ (*Id.* at SGH1-00229832).) And when he received a draft letter of intent, Charron reiterated the parties' prior agreement. (A-__ (Ex. U, at 1.)) There are no subsequent documented discussions of the Windfall Protection provision.

*Second*, the credible witness testimony demonstrates that the November 30 email chain is the last discussion among the parties concerning the proceeds Charron would share in a subsequent sale. DeBlasio testified that there were no further written or oral communications with Charron or Charron's lawyer. (A-__ (Tr. 251:9-252:5).) Old Sallyport's CFO, who was included on the November 30 email chain and who facilitated negotiations between DeBlasio and Charron, testified that there were no more negotiations regarding how the windfall protection would operate after the November 30 email chain, and that the parties never agreed that Charron would receive 20% of the total sale price. (A-__ (Tr. 865:5-9); A-__ (Tr. 911:17-912:19).) Charron's lawyer testified that he had no familiarity with the November 30 email chain and that he never discussed the

46

scope of the Windfall Provision with Charron before or during the hurried drafting process between December 3 and December 6.  (A-__ (Tr. 57:9-60:25).)

**Third**, the only contrary evidence concerning the scope of the Windfall Provision is Charron's self-serving trial testimony, which the District Court expressly refused to credit.  Charron testified at trial that after December 1 there was a conference call among himself, DeBlasio, Old Sallyport's CFO, and attorneys from WilmerHale in which DeBlasio agreed to give Charron 20% of the entire proceeds of a subsequent sale in exchange for reducing the windfall period from 3 years to 1 year.  (A-__ (Tr. 743:21-744:18).)  But this convenient testimony is belied by Charron's own earlier deposition testimony, during which he testified under oath he could not remember *any* discussion regarding the Windfall Provision apart from the November 30 email.  (A-__ (Tr. 745:23-752:13).)  Charron's trial testimony is also inconsistent with the testimony of other witnesses, none of whom recalled such a December 1st call taking place.  As the District Court found, "Charron's credibility on this point is questionable, as it was the first time in the litigation he mentioned it, and it appeared to conflict with deposition testimony that he did not recall discussing the windfall provision after the [November 30] emails . . . ."  *Charron*, 2014 WL 7336463, at *18.

In sum, no one suggested at any point during negotiations leading up the transaction that Charron had the right to share in 20% of the entire purchase price of a subsequent sale.

### C. Even if the Text of the Windfall Provision Gave Charron 20 Percent of the Total Sale Proceeds, the District Court Should Have Reformed the Contract

Even if the plain language of the Windfall Provision unambiguously entitled Charron to 20% of the total sale proceeds from the DC Capital transaction—and it does not—the District Court should have reformed the contract based on the clear and convincing evidence of the parties' mutual intent. Contract reformation is appropriate when "both parties to a bilateral transaction share the same erroneous belief and their acts do not in fact accomplish their mutual assent." *Healy*, 981 F.2d at 73 (internal quotation marks and ellipsis omitted) (citing 21 N.Y. Jur. 2d Contracts § 21 (1982)). A party seeking reformation need not offer "incontrovertible proof of mutual mistake." *Gulf Ins. Co. v. Transatlantic Reins. Co.*, 69 A.D.3d 71, 87 (1st Dep't 2009). Clear and convincing evidence will suffice. *Benderson Dev. Co., Inc. v. Schwab Bros. Trucking, Inc.*, 64 A.D.2d 447, 457-58 (4th Dep't 1978).

As explained above, the terms of the Windfall Provision, its overarching purpose, the absurd results that would otherwise follow, and every credible piece of evidence about the negotiations leading up to the transaction shows that the

parties intended the Windfall Provision to give Charron a share of only those sale proceeds that represented a windfall, that is, the excess over $65 million. As explained, the use of the word "windfall" strongly indicates that the parties intended to grant Charron a percentage of the *windfall only*. The District Court expressly found that DeBlasio wanted and intended for language "that applied only to proceeds above a threshold amount." *Charron*, 2014 WL 7336463, at *18. Emails exchanged on November 30 and December 1 demonstrate that the parties shared that intention, and that Old Sallyport's lawyer at WilmerHale intended to draft a provision consistent with that intention. And there is no credible evidence of any further discussions about the meaning of the provision. All of this more than suffices to satisfy DeBlasio's burden to offer "clear, positive and convincing evidence" of mutual mistake. *Benderson*, 64 A.D.2d at 457-58 (affirming, after bench trial, the trial court's decision to reform contract where extrinsic evidence established existence of mutual mistake); *see also Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 597 F.2d 314, 321 (2d Cir. 1979) (same); *Winmar Co. v. Teachers Ins. & Annuity Ass'n of Am.*, 870 F. Supp. 524, 536-37 (S.D.N.Y. 1994) (finding sufficient basis for jury to conclude, by clear and convincing evidence, that contract should be reformed for mutual mistake where the agreement contained internal inconsistencies and the oral and documentary evidence provided circumstantial support).

49

Against this mountain of evidence, the District Court's decision that there was no mistake based the fact that the lawyers exchanged additional drafts of the Charron Agreement after November 30 was clear error. There is simply no credible evidence that the intent of the parties changed during the course of the contractual drafting; indeed, Charron didn't even hire his own lawyer until December 1—after the relevant exchanges concerning the Windfall Provision. (A-__ (Tr. 57:9-18).)[9] And the District Court recognized that the drafting process was "rushed" to completion. *Charron*, 2014 WL 7336463, at *3. Charron's lawyer even testified that he never knew about the prior negotiations concerning the meaning of the Windfall Provision, foreclosing any possibility that his involvement caused the parties to revise the intended meaning of the clause.[10] (A-__ (Tr. 58:6-60:25).)

As for the District Court's suggestion that "the best evidence of what the parties actually agree to, as in all cases, is the contract itself," that proves far too

---

[9] Moreover, because the final language tracks the Letter of Intent closely, the parties presumably intended that subsequent amendments would have no material effect on their original bargain.

[10] For that reason this case bears no similarity to those in which allegations of mutual mistake may be rebutted by counsel who possesses personal knowledge of its client's intentions and takes care in drafting the agreement to carry out those intentions. *See, e.g.*, *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 575 (1986). Counsel here simply did not have the benefit of participating in prior negotiations and there was no indication at trial that he was apprised of them by Charron.

much. *Charron*, 2014 WL 7336463, at *19. The doctrine of reformation begins with the premise that the contract language may not reflect the parties' agreement. If unambiguous language were enough to foreclose reformation, no court could ever reform a contract.

To the extent the language and negotiating history of the Windfall Provision did not already make it clear, the District Court should have reformed the contract to effectuate the parties' agreement that, at most, the Windfall Provision would entitle Charron to 20% of the windfall proceeds in excess of $65 million.

## CONCLUSION

The District Court's decision contravenes the fundamental principle that in the absence of fraud, courts honor the negotiated terms of commercial transactions and do not rewrite them based on their own notions of equity or fair value. For all the foregoing reasons, Defendants-Appellants respectfully request that the judgment of the District Court be vacated and that the case be remanded to the District Court with instructions to enter judgment in favor of Defendants-Appellants on all of Plaintiff-Appellee's claims.

Dated: May 13, 2015

**KIRKLAND & ELLIS LLP**

  */s Jay P. Lefkowitz*
Jay P. Lefkowitz, P.C.
David S. Flugman
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**ARNOLD & PORTER LLP**

Lisa S. Blatt
555 Twelfth Street, NW
Washington, D.C. 20004
Telephone:    (202) 942-5000
Facsimile:    (202) 942-5999

*Attorneys for Appellants JPD Private Trust Company, Ltd., Sallyport Global Holdings, Inc., and John P. DeBlasio*

52

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,226 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: May 13, 2015

**KIRKLAND & ELLIS LLP**

*/s Jay P. Lefkowitz*
Jay P. Lefkowitz, P.C.
David S. Flugman
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

**ARNOLD & PORTER LLP**

Lisa S. Blatt
555 Twelfth Street, NW
Washington, D.C. 20004
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

*Attorneys for Appellants JPD Private Trust Company, Ltd., Sallyport Global Holdings, Inc., and John P. DeBlasio*